Pleadings.
NICHOLLS, J.
On the 3d of October, 1908, the following petition was filed by the plaintiffs in the civil district court:
“To the Honorable the Judges of the CíyíI District Court for the Parish of Orleans:
“The petition of the Xazoo & Mississippi Valley Railroad Company, a consolidated corporation organized and existing under the laws of the state of Louisiana, with its domicile at New Orleans, J. T. Harahan, being president thereof, hereinafter called the ‘Valley Company,’ and of the Illinois Central Railroad Company, a corporation organized and existing under the laws of the state of Illinois, with its domicile at Chicago, 111., doing business in the state of Louisiana, with its principal domicile at New Orleans, J. T. Harahan being president thereof, said company being hereinafter called the ‘Central Company,’ bring this their complaint against the - St. Louis & San Francisco Railroad Company, a corporation organized and existing under the laws of the state of Missouri, with its domicile at St. Louis, Mo., A. J. Davidson being its president, the said company doing business in the state of Louisiana with its principal domicile at New Orleans, with Ivy T. Preston as its authorized agent on whom service of citation and other judicial process should be. made, said company hereinafter called the ‘Frisco Company,’ and the Colorado Southern, New Orleans & Pacific Railroad Company, a corporation organized and existing under the laws of the state of Louisiana, with its domicile at New Orleans, La., A. J. Davidson being president thereof, said company being hereinafter called the ‘Gulf Company,’ and with due respect represent and show to the court as follows:
“That on July 31, 1907, the Rock Island Company was organized as a corporation under the laws of the state of New Jersey, with power to ‘acquire by purchase, subscription or otherwise, and to hold as investment, any bonds or other securities, or evidence of indebtedness, or any shares of capital stock, created or issued by any corporation or associations of the state of New Jersey, or of any other state, territory or country; to purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of any bonds or other securities or evidences of indebtedness created or issued by any such corporation or association; to purchase,, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of shares of the capital-stock of any such corporation or association, and, while owner of such stock, to exercise all’ rights, powers, and privileges of ownership, including the right to vote thereon; to aid in any manner any corporation or association of which any bonds or other securities or evidences of indebtedness or stock are held by the company, and to do any acts or things designed to protect, preserve, improve or enhance the value of any such bonds or other securities or evidences of indebtedness or stock; and to acquire, own. and hold such real and personal property as-may be necessary or convenient for the transaction of its business.’
“That the Rock Island Company owns the entire outstanding capital stock of the Chicago, Rock Island & Pacific Railroad Company, ai corporation organized and existing under the laws of the state of Iowa.
“That the Chicago, Rock Island & Pacific Railroad Company owns not less than 93.53 per cent, of the outstanding capital stock of the Chicago, Rock Island & Pacific Railway Company, a consolidated corporation, and not less, than 57.88 per cent, of the outstanding capital stock of the St. Louis & San Francisco Railroad Company, a corporation, the defendant in this case, hereinafter called the ‘Frisco Company.’
“That the Chicago, Rock Island & Pacific-Railway Company owns the entire capital stock of the Rock Island, Arkansas & Louisiana Railroad Company, a consolidated corporation. The Rock Island, Arkansas & Louisiana Railroad Company is the owner of a railroad extending from Eunice, La., in a northerly direction to-a connection with the lines of the Choctaw, Oklahoma & Gulf Railroad Company, a corporation, the entire stock of which is owned by the said the Chicago, Rock Island & Pacific Railway Company.
“By virtue of the said Choctaw, Oklahoma & Gulf Railroad Company, and the said Rock Island, Arkansas & Louisiana Railroad Company, the Chicago. Rock Island & Pacific Railway Company, aforesaid, controls and uses a line of railroad extending from Memphis, Tenn., to Eunice, La. Eunice, La., is a point located upon the line of the defendant the Colorado. Southern, New Orleans & Pacific Railroad Company, hereinafter called the ‘Gulf Company.’
“That the Frisco Company owns more than 83.50 per cent, of the outstanding capital stock of the Chicago & Eastern Illinois Railroad Company, a corporation owning lines of railroads extending from Chicago, 111., to St. Louis, Mo., and with other railroads, the bridge across: the Mississippi river at Thebes, 111.
“That the Frisco Company also controls, uses, and operates lines of railroads extending from Kansas City, Mo., the Thebes Bridge, and St. Louis, Mo., to Memphis, Tenn., and various lines of railroads in the states of Missouri, Arkansas, Kansas, Oklahoma, and Texas, and also a line of railroads extending from Memphis, *57 'Tenn., to Birmingham, Ala., known as the ‘Kansas City, Memphis & Birmingham Railroad,’ •and the Belt Railroad situated at Birmingham, Ala., known as the ‘Birmingham Belt Railroad.’
“That the Frisco Company also owns a half interest in the New Orleans Terminal Company, ■a corporation owning valuable terminal prop•erties in and near the city of New Orleans, La., the other half interest in the New Orleans Terminal Company being owned by the Southern Railway Company. The said New Orleans Terminal Company has acquired by •ordinances from the city of New Orleans certain valuable franchises for the maintenance and operation of terminals and tracks within that •city. Among the property owned by the New Orleans Terminal Company is the following:
“(a) Property in the city of New Orleans. 'This consists of 49 consecutive blocks in the heart of the city, on which a passenger terminal is to be erected, besides other land which is 'intended to be developed for local freight business. About 100 acres of land for outside freight yards have also been acquired, together with a perpetual lease of 1,100 feet of docks in the city proper.
“(b) Property on the River Front. The company owns about 5,500 acres of land on the •east bank of the Mississippi river, six miles below New Orleans, with a river frontage of •about two and one-half miles. Upon this land ■are the Port Chalmette terminals, 'with large wharfage and storage facilities, including a .■grain elevator with a capacity for handling •500,000 bushels of grain.
“(c) The' Belt Railroad. This consists of •about 17.85 miles of track extending from the Chalmette terminals on the south, by way of •connections with the Louisville & Nashville Railroad Company and the New Orleans & .Northeastern Railroad to the terminal property in the city of New Orleans above described, and "thence to connections with the Illinois Central Railroad and the Yazoo & Mississippi Valley .Railroad, thus connecting all the railroads that •enter New Orleans from the north and east.
“(d) Additional land in New Orleans. Five • (5) squares fronting on Canal street, running ■•seventeen hundred (1,700) feet depth, acquired .for additional passenger terminals, making a frontage of two hundred and forty-eight (248) :feet on Canal street.
“That by contract dated July 1, 1903, the .New Orleans Terminal Company, a corporation, has leased all of its property to the Southern Railway Company and the Frisco Company, jointly, for a term of 99 years, lessees agreeing to pay as rental all expenses of maintenance and operation of the property, together with the interest on the first mortgage bonds of the New Orleans Terminal Company. Under this contract, as petitioners are informed and believe, and so allege, the New Orleans Terminal Company will handle the business in and about New Orleans of the Frisco Company.
“Petitioners further show to the court that the Colorado Southern, New Orleans & Pacific Railroad Company is a corporation organized under the laws of the state of Louisiana on or about the 8th day of May, 1905, with the object and purpose to construct or otherwise acuire. maintain, and operate a railroad for the carriage of passengers and freight upon one or more tracks from a point on the Mississippi river at or near the city of New Orleans to the west boundary of the state of Louisiana, and thence through the state of Texas and to the Pacific Ocean upon such lines as might thereafter be selected by the said corporation. That, in accordance with its said charter, the said corporation, called in this petition, the ‘Gulf Company,’ began the work of constructing a railroad from De Quincy to West Baton Rouge, La., a distance of 137.40 miles, and from Eunice to Crowley, La., a distance of 21.30 miles, a total of 158.70 miles.
“Petitioners further represent that the railroad, so far as constructed, has been constructed by the Frisco Company; that the Frisco Company has acquired all the capital stock, except the directors’ shares, and all the bonds of the Gulf Company; that the Frisco Company and the Gulf Company have the same president, and the Gulf Company is shown on the publications of the Frisco Company as a Frisco line; that through the ownership by the Gulf Company of all the stock, except the directors’ shares, of the Orange & Northwestern Railway Company, a corporation, and the Beaumont, Sour Lake & Western Railway Company, a corporation, the Gulf Company upon the completion of the construction of its railroad will have a through line from Houston, Tex., to Baton Rouge, La.
“Petitioners further represent that, by an indenture dated April 30, 1907, between the Gulf Company and the Frisco Company, which recited that the lines of the Gulf Company and of the Frisco Company formed in the operation thereof connecting and continuous lines of railroad, and that the lines of the Gulf Company formed a continuous line with the road operated by the Frisco Company by direct connection over other lines constructed, which lines the Frisco Company had the right by contract to use and operate, and that the Frisco Company desired to obtain the exclusive use of the lines of railway of the Gulf Company qnd to obtain the right of exclusive use of the lines of railroad thereafter constructed by the Gulf Company, or acquired by it, the Gulf Company let, leased, and demised to the Frisco Company, its successors and assigns, its tracks and right of way extending from West Baton Rouge to De Quincy, and from Eunice to Crowley, aforesaid, and also let, leased, and demised the right of the Gulf Company under the trackage agreement bearing date October 20, 1905, between the Gulf Company and petitioners to use the lines- of petitioners between the city of New Orleans and the crossing of the Mississippi river at or near Baton Roúge, La., together with any other lines of railroad in which the Gulf Company by lease, trackage agreement, or oper *59 ating contract had any right, title, or interest. The lease also includes all manner of railroad property then owned or thereafter to be acquired by the Gulf Company, and all of the rolling stock and equipment of every description, including locomotives, cars, or vehicles of every kind then owned or thereafter acquired, and generally all the property of the Gulf Company. The term of the said lease was from April 30, 1907, to April 30, 2906, or 999 years. The said lease also let, leased, and ‘demised by the second article alb lines of railroad thereafter acquired for the same term. By the fourth article of said lease the Frisco Company agreed to pay all taxes upon the property or its earnings, all premiums of insurance, such sums, not exceeding $500 per annum, as should be requisite for the' maintenance of the corporate organization, the salaries of the necessary officers, compensation of the board of directors and other expenses. of administration of the Gulf Company, and the interest on the first mortgage gold bonds of the Gulf Company. The Gulf Company bound itself by the fifth article of the indenture to maintain the leased property in good and proper condition. By Article 6 the indenture was made renewable for successive. terms of 999 years each.
“Petitioners further aver that by a contract dated January 1, 1904, the Frisco Company entered into an agreement with the St. Louis, Iron Mountain & Southern Railway, hereinafter called the ‘Iron Mountain Company,’ a corporation, and the Texas & Pacific Railway Company, hereinafter called the ‘Texas Company,’ which recited that the Iron Mountain Company was then constructing a line of railroad from a point in the state of Arkansas opposite the city of Memphis, Tenn., to a point at or near Concordia, La., and that the Texas Company was constructing a railroad, part of which would extend from a point opposite Baton Rouge and connecting with the aforesaid Iron Mountain line at or near Concordia, and that the Frisco Company owned and operated a line of road which connected or would connect with said line of the Iron Mountain ComXjany opxxosite Memphis, Tenn., and that it was deemed to the mutual interest that the Frisco Company should also use, between the said point opposite Memphis, Tenn., and the said point opposite Baton Rouge, La., the railroads so to be constructed respectively by the Iron Mountain Company and the Texas Company. Thereupon, by article 1, an agreement was made to be in force for a period of 99 years from the date of completion of the said lines of railroad. It was agreed by article 11, § 8, that the said lines of railroad should be constructed as soon as practicable, and that until the Iron Mountain Company should construct its new line of railroad from the point opposite the City of Memphis, to and connecting with the then existing railroad of the Iron Mountain Company between Forest City, St. Francis County, Ark., and Helena, Phillips County, Ark., the Frisco Company should have the right to use and did agree to use in lieu thereof the then existing road of the Iron Mountain Company between Forest City and the junction of its. existing line between Forest City and Helena, with the railroad of the Iron Mountain Company under construction south of the said existing line between Forest City and Helena. By article 3, § 1, the Frisco Company accepted the terms, covenants, and agreements entered into by the Iron Mountain Company and the Texas Company, and by section 2 the Frisco Company agreed upon the completion of the said respective lines of railroad, and, upon being notified thereof, to begin the use of same and pay rent therefor. By section 3 it was further agreed that the cost of operating, maintenance, repairs, and renewals were to be borne jointly upon a mileage basis. By section 4 the Frisco Company agreed to pay half the taxes upon the proposed line so to be constructed. By section 9 of article 4 it was expressly agreed that the Frisco Company should have the right to assign or transfer the agreement and all of the property^ rights, and privileges therein granted to the Frisco Company to any corporation which might thereafter own, lease, or operate the lines of railroad then owned or in process of construction by the Chicago & Eastern Railroad Company, a corporation organized under the laws of the state of Illinois, and the St. Louis, Memphis & Southeastern Railroad Company, a corporation of the state of Missouri, respectively, the provisions in regard to the effect of such assignment or transfer being in the very words and identically the same with the corresponding provisions in article 39 of a certain contract dated December 3, 1903, hereinafter called the ‘Frisco contract,’ and hereinafter described.
“Petitioners aver that the said contract dated January 1, 1904, is still in effect, but that the same has never yet been performed by the Frisco Company.
“Petitioners further show to the court that by an agreement dated December 5, 1903 (the said date being less than one month previous to that of the contract between the Frisco Company, the Iron Mountain Company, and the Texas Company, last referred to), between the Central Company and the Valley Company, the Frisco Company, the Kansas City, Memphis & Birmingham Railroad Company, hereinafter called the ‘Kansas City Company,’ a corporation, and the Birmingham Belt Railroad Companj>-, hereinafter called the ‘Belt Company,’ a corxDOration, a contract was made relating to the use of certain tracks in Louisiana and Alabama and certain terminals in New Orleans and Birmingham. A copy of this contract is hereto annexed and marked ‘Exhibit A,’ and made part hereof. The contract recited, among other things, that the Frisco Company was desirous of obtaining from the Central and Valley Companies the right to use portions of their lines entering the city of New Orleans for its passenger and freight traffic, and to obtain from the Central and Valley Companies certain terminal facilities for its freight traffic in the city of New Orleans.
*61 “By article. 1 of this contract the Central Company granted the Frisco Company the right and privilege to use in common with the Central .Company, and such other company or companies as may be permitted by it to participate in such use, that section of the Chicago, St. Louis & New Orleans Railroad (leased to, and now managed and operated by, the Central Company) which extends from the connections between railroads of the Central and Valley Companies at what is known as ‘Kenner Junction,’ in the state of Louisiana, to the connection between said railroads at what is known as ‘Poydras Junction,’ in the city of New Orleans, in said state, a distance of about 95/io miles, including all side tracks, team tracks, tracks to industries, interchange tracks, stations, and all facilities and appurtenances provided for use in connection with that section of the railroad of the Central Company above described.
“By article 2 of this contract the Valley Company granted to the Frisco Company the right and privilege to use in common with the Valley Company, and such other company or companies as may be permitted by it to participate in such use, that section of the 'railroad of the Valley Company which extends from a point to be selected by the Frisco Company at or near Baton Rouge, La., to the connection between the railroads of the Central and Valley Companies at what is known as ‘Poydras Junction,’ in the city of New Orleans, in said state, a distance of approximately -8788/ioo miles, and also that section of the railroad of the Valley Company which extends from the point where the New Orleans & Western Railroad intersects the railroad of the Central Company to the upper city limits at Protection street, a distance of about l28/ioo miles, including all side tracks, passing-tracks, team tracks, tracks to industries, interchange tracks, stations, and all facilities and appurtenances provided for use in connection with those sections of the railroad of the Valley Company above described, except the yards known as TIarahan Yard’ and ‘Southport Yard,’ and the docks and facilities appurtenant thereto, known as ‘Southport Docks’ and ‘Banana and Fruit Docks.’
“Articles 4, 5, and 6 of the contract are respectively as follows:
“ ‘ (4) The Frisco Company accepts the grants made to it by the Central and Valley Companies respectively, in the preceding articles of this agreement, and covenants and agrees that it will make use of the rights and privileges therein granted, upon the terms and conditions in this agreement expressed, during the term hereinafter limited, and that for the right to use, as provided in this agreement, those sections of the railroads, of the Central and Valley Companies above described, it will pay to the Central and Valley Companies respectively, annual rents, which shall be equal to two (2) per cent, of the value of those sections of the respective railroads of the Central and Valley Companies used hereunder. The values of said sections of the railroads. of the Central and Valley Companies shall be fixed by agreement between the parties hereto, or if they shall be unable to agree by arbitration, in the manner hereinafter provided. The said rent shall be paid to the Central and Valley Companies respectively, in equal monthly installments at the end of each month of the term of this agreement, at their offices, in the city of Chicago, Illinois, in gold coin of the United States of the present standard of weight and fineness.
“ ‘(5) The Central and Valley Companies shall each keep those sections of their respective railroads, including all tracks, stations, facilities and appurtenances, the use of which is herein granted to the Frisco Company, at all times in good order and repair and in such condition as to permit the reasonably safe operation of trains and engines of the Frisco Company of such weight and at such speed as the Frisco Company may desire, and shall employ all persons and furnish all supplies necessary for the reasonably safe and convenient use thereof by all companies entitled thereto and the transaction of their railroad business.
“ ‘The Central and Valley Companies shall each keep an accurate account of all expenses incurred by them respectively for the purpose mentioned in this article — separate accounts to be kept by the Valley Company in respect to each of the two sections of its railroad above described — including all taxes, assessments and governmental charges, payable, assessable or properly chargeable on those parts of their respective railroads used by the Frisco Company hereunder, whether under general or specific assessment, and if under general assessment, then shall include in the account an estimate of the part fairly apportionable to the tracks and appurtenances in question; also including ten (10) per cent, of the cost of labor employed in and about the maintenance and repair of those sections of the railroad used hereunder, as an allowance for supervision and use of tools; and also a just proportion, computed on the basis of time card mileage, of the wages of all employes of the transportation departments of the Central and Valley Companies below the rank of General Superintendent and Assistant General Superintendent, whose duties pertain to the use of those sections of the railroads of the Central and Valley Companies respectively, used hereunder, and the movement of cars, engines, and trains thereon; and shall render to the Frisco Company monthly statements of the expenses so incurred during each month during the term of this agreement, within fifteen days after the expiration of such month. Such statements shall also contain accurate accounts of the mileage of cars and engines in the service of the Frisco Company on those sections of the railroads of the Central and Valley Companies above described, and of the total car mileage thereon, each engine with tender to be counted as two cars, but switch engines, while engaged in switching on side tracks and tracks to industries, shall not be included in the count.
“ ‘ (6) In addition to the rent mentioned in article four of this agreement, the Frisco Com *63 .pany, shall, and hereby agrees that it will, pay to the Central and Valley Companies respectively, such proportion of the monthly expenses in•eurred by each for the purposes mentioned in the preceding article of this agreement, as the mileage of cars and engines in the service of the Frisco Company on the said tracks of the 'Central and Valley Companies respectively, shall bear to the total engine and car mileage thereon during the same month. Payments shall be made to the Central and Valley Companies respectively, at their office in Chicago, within fifteen days after the receipt of the statements mentioned in the preceding article in gold coin of the United States of the present standard 'of weight and fineness.’
“Article 11 of the contract is as follows:
“ ‘ (11) The Central and Valley Companies, subject to the limitations hereinafter expressed, hereby agree to switch without discrimination the freight cars of the Frisco Company over their main tracks, along the bank of the Mississippi river to St. Joseph street; thence up St. Joseph to east end of what is known as “Gov•ernment Yard” to and from the side tracks, team tracks, interchange tracks, and tracks to industries, connected therewith (exclusive of the levee yard and tracks therein, and also ex■clusive of the docks and facilities appurtenant thereto known as Stuyvesant Docks and Banana and Fruit Docks), which are shown on the plat hereto attached and made a part hereof marked “Exhibit B,” the main tracks thereon being ■ indicated by the yellow and red lines and the side tracks and tracks to industries by the brown lines.
“ ‘The Frisco Company hereby agrees to 'switch the freight cars of the Central and of the Valley Company in like manner, without ■discrimination, over all the tracks which the Frisco Company has the right to use in and about the city of New Orleans, to and from 'the side tracks, team tracks, interchange tracks, 'and tracks to industries connected therewith, to the northwest end of the so-called “Basin Yard” 'and exclusive of the so-called “Basin Yard,” and the Chalmette Yard and Dock, and Banana ■'and Fruit Docks.
“ ‘The cars which the Central and Valley 'Companies and the Frisco Company desire to liave switched over the tracks above mentioned, shall be delivered to each other at some place to "be agreed upon by the parties hereto, and shall be returned to each other at the same place.
“ ‘The three parties last aforesaid hereby agree to pay each other for switching cars as aforesaid $1.50 per car for each car switched —payments to be made within fifteen (15) days after the presentation of bills therefor, at the respective general offices of the parties presenting such bills, and in the coin specified in article six hereof. The said switching charge, in ■each case, shall include one free movement of the same car empty.’
“The switching rate of $1.50 per car for each car switched did not represent the full value of the service to be performed, but was a nominal charge in consideration of the reciprocal privileges therein provided. The tracks referred to as those which the Frisco Company had the right to use in and about the city of New Orleans were the tracks of the New Orleans Terminal Company, and by reason of the said agreement the Central and Valley Companies acquired valuable switching privileges in the city of New Orleans, in consideration for which the Central and Valley Companies conferred on the Frisco Company valuable switching privileges upon the tracks of the Central and Valley Companies.
“The said contract further provided that the Central Company should have the right and privilege to use in common with the Kansas City Company, and such other company or companies as might be permitted by it to participate in such use, a section of the railroad of the Kansas City Company which might extend from a point at or near Jasper to Birmingham, Ala. The Belt Company upon similar terms granted to the Central Company the use of certain of its tracks at or near Birmingham, Ala.
“By article 19 of the agreement it is provided that the Central Company agreed that whenever it should enter Birmingham by a railroad from the north it would make use of the right and privilege therein granted and pay the Kansas City Company rent therefor, which would be equal to two (2) per cent, of the value of the sections of the railroad of the Kansas City Company used thereunder, and to the Belt Company annual rents which would equal one-half of the annual interest on the bonded indebtedness of the Belt Company, as by article 19 will more fully appear. ,
“Article 35 of the contract is as follows:
“ ‘(35) It is further understood and agreed by and between the parties hereto that the grants made in this agreement by the Central and Valley Companies respectively to the Frisco Company, and those made by the Kansas City and Belt Companies respectively to the Central Company, shall be interdependent, and that if the Central Company without being in default, shall be wholly deprived of the use and enjoyment of the rights and privileges in this agreement granted 'to it by the Kansas City Company or shall be wholly deprived of the use and enjoyment of the rights and privileges in this agreement granted to it by the Belt Company, either the Central or Valley Company, or both, may, at any time while the Central or Valley Company is so deprived of the rights and privileges granted to it by the agreement, exclude the Frisco Company from the further use and enjoyment of the rights and privileges in this agreement granted to it by the Central and Valley Companies over their respective lines, and if the Frisco Company without being in default, shall at any time be wholly deprived of the rights and privileges in this agreement granted to it by the Central Company, or shall be wholly deprived of the use and enjoyment of the rights and privileges in this agreement granted to it by the Valley Company, either the Kansas City or Belt Com *65 pany, or both, shall likewise have the right at any time while the Frisco Company is so deprived of the use and enjoyment of the rights and privileges granted to it by the Central and Valley Companies, to exclude the Central Company from the further use and enjoyment of the rights and privileges herein granted to it by the Kansas City and Belt Companies over their respective lines.’
“Petitioners show to the court, by the failure of the Frisco Company to use the tracks provided for its use by the said contract, petitioners have been hitherto wholly deprived of the reciprocal protection security of rights guaranteed by this article.
“Article 37 of said contract is as follows:
“ ‘(37) This agreement shall take effect as to the rights and privileges herein granted to the Frisco Company and as to the rents and charges to be paid by the Frisco Company therefor,when the tracks owned, used or operated by the Frisco Company shall be connected by a bridge, ferry or otherwise with the tracks of the Valley Company at the place near Baton Rouge mentioned in article 2 hereof, and as to the right and privileges herein granted to the Central Company and as to the rents and charges to be paid by the Central Company therefor, it shall take effect at any time during the term of this agreement when the tracks owned, used or operated by the Central Company shall be connected with the tracks of the Kansas City Company at the point provided for in article 12 hereof and shall continue in force for ninety-nine years after the first of the connections mentioned in this article shall be made!
“In article 39 of said contract, the following provisions occur:
“ ‘It is further expressly agreed that the Frisco Company shall have the right to assign or transfer this contract, and all the property rights and privileges herein granted to the Frisco Company, to any corporation which may hereafter own, use, lease or operate the main lines of railroad now owned or in process of construction by the Chicago and Eastern Illinois Railroad Company, a corporation of the state of Illinois, and the St. Louis, Memphis & Southeastern Railroad Company, a corporation of the state of Missouri, respectively.’
“Petitioners further aver that at the time said contract was made the parties thereto had in contemplation that the Frisco Company would immediately either cause to be built a railroad extending down the west side of the Mississippi river from Memphis to a point opposite Baton Rouge, La., or would obtain an agreement with the St. Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company for the use of the tracks of the two companies last named, thereby connecting the tracks of the Valley Company at Baton Rouge, La., with the tracks controlled or used by the Frisco Company from Chicago and St. Louis respectively, to Memphis, Tenn.; that is to say a north and south line extending from, at, or near Memphis, Tenn., to a point opposite or near Baton Rouge, La.; and petitioners further aver that the said north and south line so contemplated by the said parties was subsequently obtained by virtue of the said agreement between the Frisco Company and the said St. Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company, dated January 1, 1904, being less than one month later than the said contract between the Central and Valley Companies and the Frisco and other companies already referred to, and that the railroads referred to in the said contract, dated January 1, 1904, have been constructed, and that the Frisco Company has both the right and the power to use the north and south line of the St. Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company aforesaid, or its equivalent.
“Petitioners further show to the court that by virtue of articles 4 and 37, above quoted, of the said contract, dated December 5, 1903, the Frisco Company agreed to make use of the rights and privileges granted by the said contract for a term of 99 years after the first of the connections mentioned in article 37 should be made. The first of the said connections was made by the Central Company with the tracks of the Kansas City Company at or near Jasper, Ala., upon the 19th day of April, 1908. Petitioners aver that from and after the date aforesaid the Central Company has made use of the rights and privileges granted to it by the said contract, and performed each and every obligation thereof by it to be performed; but that the Frisco Company has not made any use of the said tracks of the Central and Valley Companies, or made any payments to the Central and Valley Companies, as by the contract it was its duty to do.
“Petitioners further show to the court that by an agreement dated October 28, 1905, between the Central Company, the Valley Company, and the Gulf Company, a contract in. many respects similar to the said contract dated December 5, 1903,'was made. A copy of this contract is hereto annexed, and marked ‘Exhibit B’ and made part hereof. This contract recited that the Gulf Company was desirous of obtaining from the Central and Valley Companies the right to use portions of the lines of railroads of the Central and Valley Companies into the city of New Orleans, and to obtain from the Central and Valley Companies certain terminal facilities for its freight traffic in- the said city of New Orleans.
“By articles 1 and 2 of the said contract dated October 28, 1905, hereinafter called the ‘Gulf contract,’ substantially the same grants were made to the Gulf Company as by articles 1 and 2 of the said contract dated December 5, 1903, hereinafter called the ‘Frisco contract,’ were made to the Frisco Company.
“By article 4 of the Gulf contract, in the same manner as by article 4 of the Frisco contract, the Gulf Company agreed to pay an annual compensation equal to two (2) per cent. *67 of the value of those sections of the respective railroads of the Central and Valley Companies used thereunder.
“By article 5 of the Gulf contract precisely similar agreements were made in regard to maintenance and operation charges as by article 5 of the Frisco contract.
“By article 6 of the Gulf contract the Gulf Company in like manner agreed to pay to the Central and Valley Companies, respectively, such proportion of the monthly expenses incurred by each for the purposes mentioned in article 5 of the agreement as the mileage of cars and engines in the service of the Gulf Company on the said tracks of the Central and Valley Companies respectively should bear to the total engine and car mileage thereon during the same month. Article 6 of the said contract was a. valuable consideration thereof, and a compliance therewith would have the effect of materially reducing the maintenance and operating-charges of the Valley and Central Companies respectively.
“By article 10 of the Gulf contract the Central and Valley Companies agree to do the same switching- as is provided in article 11 of the Frisco contract. The same nominal price of $1.50 per car was named as the consideration of the reciprocal switching service, it being contemplated by the parties to the said contract that the Gulf Company would secure from the New Orleans Terminal Company the same switching privileges as were enjoined by the Frisco Company, and that the Central and Valley Companies should in any event have the right of reciprocal switching over the terminals of the New Orleans Terminal Company.
“The negotiations conducted by the Gulf Company were through the same parties who negotiated the Frisco contract, and it was the understanding of the parties that the financial interests owning the Gulf Company were the the same as those owning the Frisco Company. At that time it was represented to the Central and Valley Companies that the Gulf Company had not yet made a contract for its switching privileges in New Orleans, and the obligation of the Gulf Company in article 10 was for that reason expressed as follows:
“ ‘The Gulf Company hereby agrees to switch the freight cars of the Central Company and the Valley Company in like manner, without discrimination, over all the tracks which the Gulf Company has or shall have the right to use for the purpose in and about the city of New Orleans, and to and from the side tracks, team tracks, interchange tracks, and tracks to industries connected therewith.’
“Article 19 of the said contract provides as follows:
“ ‘This agreement shall take effect as to the rights and privileges herein granted and as to the compensation and charges to be paid therefor, when the tracks owned, used, or operated by the Gulf Company shall be connected by ferry or otherwise, with the tracks of the Valley Company at the place near the Baton Rouge mentioned in article 2 hereof, but in no event later than October 1, 1908, and shall continue in force for ninety-nine (99) years after the connection mentioned in this article shall be made. If such connection shall not be made on or before October 1, 1908, this agreement shall cease and, determine upon that date.’
“In article 21 of the said contract it is further provided as follows:
“ ‘The compensation payable by the Gulf Company under this agreement shall in any and every event be cumulative and, in addition to that payable by the St. Louis & San Francisco Railroad Company, or its successors or assignee or transferee under its certain trackage contract bearing date December 5, 1908, with the Central and Valley Companies and others, and if at any time during the term of this agreement the said railroad of the Gulf Company shall be owned, leased, used or operated by any company which shall then or thereafter exercise the rights granted by the Central and Valley Companies to the St. Louis & San Francisco Railroad Company, under the said trackage contract bearing date December 5, 1903, or if the Gulf Company or its successor to the rights herein granted shall in any way succeed to the rights granted to the St. Louis & San Francisco Railroad Company under said trackage contract, the amount of compensation payable by the Gulf Com-any in accordance with the terms of article , of this agreement, shall be in no wise affected, and the said compensation payable by the Gulf Company, under article 4, of this agreement, shall still be payable cumulatively and in addition to the compensation payable by the said St. Louis & San Francisco Railroad Company, or its successor, assignee or transferee, under article 4 of said contract of December 5, 1903, between the Central and Valley Companies and the St. Louis & San Francisco Railroad Company and others.’
“Petitioners further show to the court that the railroad of the Gulf Company contemplated by the parties was an east and west line-through the state of Louisiana, extending from Baton Rouge in the direction of Houston, Tex., and running in a direction substantially at right angles with that contemplated in the north and south line of the Frisco contract aforesaid. The purpose and intent of the provision of article 21, above quoted, was to prevent the Gulf contract being used as a substitute for the Frisco contract, or as the means of evading the obligations assumed by the Frisco Company under the Frisco contract, and to provide for the very contingency which has now occurred of both contracts being lodged in the same hands- and an attempt made to escape from the Frisco contract.
“Petitioners further show to the court that, notwithstanding that by article 4 of the Gulf' Contract the Gulf Company accepted the grants, of the Central and Valley Companies and covenanted and agreed to make use of the rights, and privileges therein granted, the Gulf Com *69 pany negligently and wrongfully and for its own purposes delayed the work of constructing its railroad, and negligently and wrongfully did not connect the tracks owned, used, or operated by it by ferry or otherwise with the tracks of the Valley Company at the place near Baton Rouge mentioned in article 2 thereof on or before October 1, 1908. Petitioners further show that, on the contrary, the Gulf Company failed to construct or complete its railroad within the time so provided, and particularly failed to connect by ferry or otherwise its tracks west of the Atchafalaya river with the tracks of the Valley Company as provided by article 19 of the said contract on or before October 1, 1908, and that the tracks of the Gulf Company west of the Atchafalaya river, and comprising much of the greater portion of the railroad of the Gulf Company, have not yet been connected by ferry or otherwise with the tracks of the Valley Company as provided in said article 19, and that the Gulf Company was not upon that date, and is not at this present time, ready to use for its passenger and freight traffic the terminal facilities of the petitioners in the said city of New Orleans, whereby the petitioners have been deprived of the consideration for which they stipulated; that the Gulf Company claim the right to use the railroads of the petitioners before the Gulf Company has built its own railroad, or is able to turn over to the lines of petitioners’ railroads the traffic of a completed railroad, so that the maintenance, repair, operation, taxes, and other charges of petitioners should be borne in proportion to the traffic of the Gulf Company upon a mileage basis as provided in article 6 of the Gulf contract.
“Petitioners further show to the court that the Prisco Company is the only real party in interest under both the Frisco and the Gulf contracts; that, by virtue of article 11 of the Frisco contract and article 10 of the Gulf contract, the petitioners are entitled, subject to the exceptions stated in the said article 13, to reciprocal switching privileges in the city of New Orleans covering the .terminals of the New Orleans Terminal Company, half of which, as petitioners are informed and believe, and so allege, is owned by the Frisco Company, and which said terminal properties, petitioners aver, are also leased to the Frisco Company.
“Petitioners further show that, for the purpose of obtaining the use of the terminals of petitioners in New Orleans, for switching privileges without making the return of reciprocal switching privileges intended by the said contracts, and each of them, and under pretense that the Gulf Company may lawfully make no provision for switching the cars of the petitioners or either of them, no switching privileges have been acquired for the Gulf Company in the city of New Orleans by the Frisco Company, although abundantly able to acquire the same, of which the benefit would be given the petitioners, or either of them; but it is the intention of the Frisco Company to make sjich an arrangement that the cars of the Gulf Company will be switched upon the terminals of the New Orleans Terminal Company, but the cars of petitioners and of each of them will not be switched upon the terminals of the New Orleans Terminal Company at the rate of $1.50 per car provided in the said contracts; that unless this honorable court shall interfere, the peculiar corporate relationship of the Frisco Company to the New Orleans Terminal Company, and to the Gulf Company as heretofore set forth, will enable the Frisco Company, under the mask of separate corporate organizations, to defraud the petitioners, and each of them, out of the reciprocal switching privileges in New Orleans stipulated in the said contracts.
“Petitioners further show to the court that by article 4 of the Frisco contract and article 4 of the Gulf contract, in connection with article 21 of the Gulf contract, the rental under the two contracts is cumulative, and that, in the event that the Gulf contract is in effect, the Frisco Company is, or the Frisco Company and the Gulf Company are together, bound to pay 4 per cent, instead of 2 per cent, of the value of those sections of the respective railroads of the Central and Valley Companies, the use of which is granted under the said contracts.
“Petitioners further show that the Frisco Company, with the intention to defraud the petitioners out' of the benefit of the cumulative compensation provided by the two contracts, are planning to use the railroad of the Rock Island, Arkansas & Louisiana Railroad Company, the entire capital stock of which is owned by the Chicago, Rock Island & Pacific Railway Company, instead of the railroads of the Saint Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company, so that the traffic of the Frisco Company, instead of moving down the west bank of the Mississippi river to Baton Rouge, will be diverted by way of Little Rock, Ark., and Eunice, La., and turned in upon the line of the Gulf Company, thereby intending to obtain substantially the same advantages as are given under both contracts by paying the compensation provided under the Gulf contract only, and thereby wholly defrauding the Central and Valley Companies out of the rights contracted for under the Frisco contract. -
“Petitioners further show that the Frisco Company has the power and it is its duty to perform the Frisco contract, and that the Frisco Company is in default thereunder by reason of its failure to use the privileges granted and to pay the rents and the proportion of petitioners’ expenses for maintenance, repairs, operation,. and taxes and other charges as provided in articles 4 and 6 of the Frisco contract from and after the 19th day of April, 1908, when the tracks of the Central Company were connected with the tracks of the Kansas City Company near Jasper, Ala.
“Petitioners further show that the tracks of the- Gulf Company east of the Atchafalaya river are now owned, used, or operated by the Frisco Company, and in the event the. court shall hold that the said tracks have been connected with the tracks of the Valley Company, then, in ac *71 cordance with article 37 of the Frisco contract, the whole of the Frisco contract is now binding and of full effect.
“Petitioners further show that under article 4 of the Frisco contract it was the duty of the Frisco Company within reasonable time to make use of the rights and privileges therein granted, and that a reasonable time for the purpose has already elapsed, and that the Frisco Company has failed so to do, but that instead of so doing the Frisco Company, as petitioners are_ informed and believe and so allege, availed itself of an agreement with the Mobile & Ohio Railroad Company and the New Orleans & Northeastern Railroad Company, dated September 19, 1903, whereby the Frisco Company obtained trackage rights over the lines of the Mobile & Ohio Railroad Company and the New Orleans & Northeastern Railroad Company between Tupelo, Miss., and New Orleans, La., a distance of 338.45 miles, which said agreement went into effect on January 1, 1905, and the Frisco Company for its own profit and advantage did not send its trafile down the west side of the Mississippi river, but made use of the tracks of the Kansas City, Memphis & Birmingham Railroad Company between Memphis, Tenn., and Tupelo, Miss., and, availing itself of the trackage rights above mentioned, used the rights and privileges granted in the said agreement with the Mobile & Ohio Railroad Company and the New Orleans & Northeastern Railroad Company, instead of using the rights and privileges granted by the Frisco contract, which it was its duty to make use of. as in the said contract made and provided.
“Petitioners further represent that the amount involved in this suit exceeds the sum of $5,000, exclusive of' interest.
“Wherefore petitioners pray that the St. Louis & San Francisco Railroad Company, through its authorized agent. Ivy T. Preston, and the Colorado Southern, New Orleans & Pacific Railroad Company, through its president or other proper olEcer, be cited to answer hereto; that upon trial there be judgment in their favor declaring the agreement entered into by and between the Colorado Southern, New Orleans & Pacific Railroad Company and petitioners, of date October 25, 1905. hereto annexed as ‘Exhibit B,’ to be null and void and of no effect.
“Petitioners further pray that there be judgment in their favor, and against the St. Louis & San Francisco Railroad Company, decreeing the agreement entered into by and between petitioners and the St. Louis & San Francisco Railroad Company, of date December 5, 1903; which agreement is hereto annexed and made part of this petition as ‘Exhibit A,’ to be binding on all parties thereto, and in full force and effect from and after the. 19th day of April, 1905, in all its parts, and especially as to the lines of railroads therein described, the use of which is granted to the St. Louis & San Francisco Railroad Company, and that petitioners, and each of them, respectively, do have and recover judgment against the St. Louis & San Francisco Railroad Company for such sums as are payable to them and to each of them under articles 4 and 6 of the agreement annexed to and made part of this petition as ‘Exhibit A,’ and that judgment be rendered in petitioners’ favor and against the said St. Louis & San Francisco Railroad Company, ordering and compelling it, the said St. Louis & San Francisco Railroad Company, to perform the reciprocal switching duties provided in article 11 of the agreement annexed to and made part of the petition as ‘Exhibit A.’
“In the alternative, should the court hold that the agreement annexed to and made part of this petition as ‘Exhibit B’ is binding and in full force and effect, then and in that event petitioners pray that there be judgment in their favor decreeing that, until the Colorado Southern, New Orleans & Pacific Railroad Company shall acquire switching rights over the property of the New Orleans Terminal Company, and shall give petitioners the reciprocal switching rights contemplated by article 10 of the agreement annexed to and made part of this petition as ‘Exhibit B,’ that petitioners and neither of them shall be required to switch for the Colorado Southern, New Orleans & Pacific Railroad Company at the rate of $1.50 per car, as in said article provided, and that the court furthermore order that petitioners shall not be required to receive under the agreement annexed to and made part of this petition as ‘Exhibit B’ freight and passenger traffic moving north or south between Memphis and New Orleans, and such other traffic as would properly fall within the scope of the agreement annexed to and made part of the agreement as ‘Exhibit A.’
“And petitioners further pray in the alternative that, in the event the court should hold that the agreement annexed to and made part of this petition as ‘Exhibit B’ is binding and in full force and effect, that the court will further order that petitioner shall not be required to receive under the agreement annexed to and made part of the petition as ‘Exhibit A,’ freight or passenger traffic moving east and west, and such other traffic that would properly fall within the scope of the agreement annexed to and made part of the petition as ‘Exhibit B,’ and that the court, in the event that it shall hold that one only of the two contracts is in effect, will make such other and further orders as will be necessary to protect petitioners from the abuse of one contract being made to serve more or less the purpose, of both contracts.
“And petitioners further pray; for such further and general relief as in equity and in good conscience they may be entitled to receive.”
Defendants excepted to the petition of the plaintiffs herein, and for ground of exception said:
(1) That there was a misjoinder of parties and„of causes of action herein.
(2) That, if there was no misjoinder, the *73 action was premature as against both of tbe defendants.
(3) That the petition disclosed no cause of action against the defendants jointly or separately.
They prayed that this exception be maintained, and the plaintiffs’ demand be rejected with costs.
On January 11, 1909, the district court rendered judgment in favor of the defendants, and against the plaintiffs, sustaining the several exceptions filed by the defendants and dismissing the suit of the plaintiffs, assigning the following reasons for the judgment:
“So far as concerns the contract herein known as the ‘Frisco contract,’ I do not think this petition shows a cause of action. That contract is not in force, and will not be until the Frisco company connects with the Valley tracks at or near Baton Rouge, something it may never do, being under no obligation to that effect. The Frisco Company has indeed the right to make the connection if it see fit to do so, which right it acquired in consideration of a similar right granted by it to the Central Company. The latter chose to avail itself of its right, but in doing so it imposed thereby no obligation on the Frisco Company.
“The contention is further made that the Frisco Company practically owns the Gulf Company, and has a lease upon the property of the latter to all intents and purposes perpetual; that the tracks of the Gulf Company have, been connected with the Valley tracks at or near the same place at which the Frisco Company has the right to connect, and therefore the Frisco Company must be held to have connected with the Valley tracks.
“There is no merit in the contention. The Gulf contract contemplated east and west bound traffic, the Frisco contract north and south bound. The fact that the connection with plaintiffs’ tracks was under both contracts to be made at or near the same place was merely a coincidence, and, when it is so recognized, the contention falls of its own weight. For the Gulf contract itself provides that it may be assigned to the Frisco Company, and in that case the two contracts were still to be treated as entirely separate and distinct, and so long as the Gulf contract is used by the Frisco company according to its true intent and proper purpose it imposes in the Frisco Company no obligation whatsoever under the Frisco contract.
“Nor does the petition as drafted set forth any ground for presently annulling the Gulf contract. The Gulf Company has up to this time done all that it was required to do in order to acquire rights under that contract, and courts will not annul a contract merely because of some vague fear on the part of one of the parties that the other party contemplates making some fraudulent use of it calculated to injure the complainant.
“On the other hand, if such is the intention of one of the parties, the other will not be without a remedy when the fraudulent intent is carried into execution, since any misuse of a contract is an active breach thereof, and gives rise to an action not only for damages, but also for the rescission of the contract itself. Civ. Code, art. 2046.
“If, therefore, it was the intention under the Gulf contract that the Central and Valley Companies should enjoy the same switching as they were to have under the Frisco contract (as to which I express no opinion), and the defendants by reason of their peculiar corporate relations with each other and with the New Orleans Belt & Terminal Company are able to withhold these privileges, plaintiffs have but to tender their cars to the aforesaid belt and terminal company and let the latter refuse to receive them.
“Or, if it was the intention under the Frisco contract that the traffic originating or routed over the Choctaw, Oklahoma & Gulf Railroad Should come over the route contemplated in the Frisco contract (about which I express no opinion), but by reason of their peculiar corporate relations with each other and with the Rock Island Companies the defendants are able to deflect trains at Little Rock and send them by way of Eunice, under pretense of the Gulf contract, instead of along the route contemplated by the Frisco contract, or by way of Tupelo (a longer route for traffic, originating west of Little Rock), plaintiffs have but to let trains so deflect and receive them, under protest.
“And in either case plaintiffs may then bring their action to annul the Gulf contract because of the fraudulent misuse thereof, and for all such damages as they may suffer; and the whole controversy will then come before the court in such shape as to permit a full determination of the rights of all parties, something which cannot be done with the pleadings in their present shape. Railroad Co. v. Construction Co., 49 La. Ann. 49, 21 South. 171.
“I am therefore of opinion that the exceptions herein filed are well taken, and plaintiffs’ suit must be dismissed, which, however, prejudices in no manner their rights along the lines above mentioned. The several exceptions herein filed are therefore maintained, and plaintiffs’ suit is dismissed at their cost.”
Plaintiffs appealed.
The following answer to the appeal has been filed in this court:
“The Colorado Southern, New Orleans & Pacific Railroad Company, made one of the defendants in the lower court and one of the appellees in this court, for answer to the appeal, hereby withdraws all of its pleas and exceptions, and consents and agrees that, so far as *75 it is concerned, a judgment shall he entered in this cause setting aside and declaring null and void the contract of date October 28, 1905.
“And now comes the St. Louis & San Francisco Railroad Company, averred in plaintiffs’ petition to be the lessee of the Colorado Southern, New Orleans & Pacific Company, and in its said averred capacity as lessee gives its consent to the foregoing plea and withdraws its plea of misjoinder herein filed, still insisting in its plea of no cause of action as to its contract with the plaintiffs.
“Wherefore defendants pray that so much of the judgment below as declares that the petition discloses no cause of action as to the matters and things set up against the St. Louis & San Francisco Railroad Company be affirmed, and that so much of said judgment as dismisses the action against the Colorado Southern, New Orleans & Pacific Railroad Company be reversed, and said cause be remanded to the lower court with instructions to enter a judgment against the Colorado Southern, New Orleans & Pacific Railroad Company, declaring the contract of October, 2S, 1905, between the plaintiffs and said company, null and void and of no effect.”
The first prayer of the petition of plaintiffs is that the agreement entered, into by and between them and the Colorado Southern, New Orleans & Pacific Railroad of date October 25, 1905, be decreed null, void, and of no effect. The Colorado Southern, New Orleans & Pacific Railroad has withdrawn, as has been stated, the exceptions which it filed, and consents that this prayer of the plaintiffs be granted. The issues on that branch of the case are no longer before us for decision.
The second prayer is that the court decree that the agreement entered into by and between the plaintiffs and the St. Louis & San Francisco Railroad Company, of date December 5, 1903, be decreed to be binding on all parties and in full force and effect from and after the 19th day of April, 1905, in all its parts, and especially as to the lines of railroad herein described, the use of which is granted to the St. Louis & San Francisco Railroad, and that petitioners and each of them respectively do have and recover judgment against the St. Louis & San Francisco Railroad Company for such sums as are payable to them and to each of them under articles 4 and 6 of the agreement annexed to and made part of the petition, Exhibit A, and that judgment be rendered in petitioners’ favor and against the said St. Louis & San Francisco Railroad,. ordering and compelling the said St. Louis & San Francisco Railroad Company to perform the reciprocal switching duties provided in article 11 of the agreement annexed as “Exhibit A.”
The prayer “that the court decree that the contract of December 5, 1903, so far as the Frisco road is concerned, is in full force and effect and binding on all parties since the 19th day of April, 1895,” is based upon the fact that that is the date on which the Central Railroad entered Birmingham by a railroad from the north, made connections with the tracks of the Kansas City Company at or near Jasper, Ala., and commenced making use of the rights and privileges granted it under the contract. Under plaintiffs’ view of the rights and obligations of parties, the right and the duty of the defendant company to make use of the tracks of the Central and Valley at or near Baton Rouge, and to pay for trackage and share in the expenses of operating the road between Baton Rouge and New Orleans, commenced ipso facto from that same day.
We do not accept that view of the contract. By its thirty-seventh article the agreement was “to take effect as to the rights and privileges granted to the Frisco Company and as to the rents and charges to be paid by the Frisco Company therefor when the tracks owned, used, and operated by the Frisco Company shall be connected by a bridge, ferry or otherwise' with the tracks of the Valley Company at the place near Baton Rouge mentioned in article 2 of the contract” — that is, at a point to be selected by the Frisco Company at or near Baton Rouge.
The petition alleges that at the time of the making of said contract it was in con *77 templation that the Frisco Company would immediately cause to be built a railroad extending down the west bank of the Mississippi river from Memphis to a point opposite to Baton Rouge, or would obtain an agreement with the St. Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company for the use of the tracks of the two companies last mentioned, thereby connecting the tracks of the Valley Company at Baton Rouge with the tracks controlled or used by the Frisco Company from Chicago and St. Louis respectively to Memphis — that is to say, to a point opposite or near Baton Rouge — and that said north and south line so contemplated by the said parties was subsequently obtained by virtue of the said agreement between the Frisco Company and the said St. Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company dated January 1, 1904, being less than one month later than the said contract between the Central and Valley Companies already referred to, and that the roads referred to had been constructed, and that the Frisco Company had both the right and the power' to use the north and south line of the St. Louis, Iron Mountain & Southern Railway Company and the Texas & Pacific Railway Company or its equivalents. The petition goes on to declare that it was the duty of the Frisco Company within a reasonable time to make use of the rights and privileges granted to it in the contract and that a reasonable time had elapsed and it had failed to do so, and, instead of doing so, it has, as petitioners were informed and believed and so alleged, availed itself of an agreement with the Mobile & Ohio Railroad Company and the New Orleans & Northeastern Railroad Company dated September 18, 1909, whereby the Frisco Company obtained trackage rights over the lines of the Mobile & Ohio Railroad Company and. the New Orleans & Northeastern Railroad Company between Tupelo and New Orleans, a distance of 338 miles, which agreement went into effect on January 1, 1905, and the. Frisco Company, for its own profit and advantage, did not send its traffic down the west side of the Mississippi river, but made use of the tracks of the Kansas City, Memphis & Birmingham Railroad Company between Memphis, Tenn., and Tupelo, Miss., and, availing itself of the trackage rights above mentioned, used the rights and privileges granted to it by the said agreement with the Mobile & Ohio Railroad Company and the New Orleans & Northeastern Railroad Company, instead of using the tracks and privileges granted by the Frisco contract, which it was its duty to make use of, as in the said contract made and provided. That the Frisco Company had not made any use of the said tracks of the Central and Valley Companies, as under the contract it was its duty to do.
The petition does not allege that the Frisco Company has ever selected any point on the Valley tracks at or near Baton Rouge at which to make connection with the Valley tracks at that selected point by bridge, ferry, or otherwise, or that it had ever been called upon to do so, nor does it call upon the defendant now to do so. It does not allege that the parties had ever agreed upon any valuation of the sections of the tracks to be used under the grant, or that such valuation had been fixed by arbitration, or that any demand had been made for the fixing of such values. It is evident that the suit as brought is not for an amount alleged to be due by the defendant company as having resulted from the actual use and exercise by it of the rights and privileges which could have accrued to it from the contract between itself and the plaintiffs. No amount • is specified as being due by the defendant on that ground. No judgment is asked for a *79 particular sum, and no basis for such a judgment is set out in the petition. We are not called on to decide whether or not the contract between the plaintiffs and the defendant company is a presently existing one, in order to make the decree rendered in this case the basis for a future suit and decree. We have no right to fix the rights and obligations of parties under an alleged contract, unless invoked incidentally and in aid of a present controversy between the parties as arising from and under that contract.
We cannot determine in anticipation of such a controversy what the rights and obligations of parties are or may be. We will have to wait until such a controversy actually arises. Railroad Co. v. Construction Company, 49 La. Ann. 49, 21 South. 171; State ex rel. Roman v. Board of Supervisors, 49 La. Ann. 578, 21 South. 731; New Orleans & Northwestern Railway Company v. Ferry Co., 104 La. 53, 28 South. 840; State ex rel. Harr v. Judge, 52 La. Ann. 4, 26 South. 812.
The petition does not assert that the sending by the defendant of a part of its north and south business to New Orleans by the way of Memphis and Tupelo under the alleged agreement between itself and the Mobile & Ohio Railroad Company was a violation of its contract rights, nor does it set out how much of said business has been sent to New Orleans in that manner. The allegations of the petition touching the action of the defendant company in respect to the tracks of the Colorado Southern Railroad Company, and the action of the latter corporation touching the same matter, are that, notwithstanding that by article 4 of the Gulf contract the Gulf Company accepted the grants of the Central & Valley Companies and covenanted and agreed to make use of the rights and privileges therein granted, the Gulf Company negligently and wrongfully and for its own purposes delayed the work of constructing the railroad, and negligently and wrongfully did not connect the tracks owned, used, or operated by it by ferry or otherwise with the tracks of the Valley Company at the place near Baton Rouge mentioned in article 2 thereof on or before October 1, 1908; that, on the contrary, the Gulf Company failed to construct or complete its railroad within the time so provided, and particularly failed to connect by ferry or otherwise the tracks west of the Atchafalaya river with the tracks of the Valley Company, as provided by article 19 of the said contract in or before October,, 1908, and that the tracks of the Gulf Company west of the Atchafalaya river, and comprising much of the greater portion of the railroad of the Gulf Company, have not yet been connected by ferry or otherwise with the tracks of the Valley Company as provided in said article 19, and the Gulf Company was not at that date, nor was it at the present time, ready to use for its passenger and freight traffic the terminal facilities of petitioners in the said city of New Orleans, whereby petitioners had been deprived of the consideration for which they stipulated that the Gulf Company claimed the right to use the railroads of the petitioners before the Gulf Company had built its own railroads or was able to turn over to the lines of petitioners’ railroads the traffic of a completed railroad, so that the maintenance, repair, and. operation taxes and other charges of petitioners should be borne in proportion to the traffic of the Gulf Company upon a mileage basis as provided in article 6 of the Gulf contract. The petition then goes on to declare that the Frisco Company, with “the intention to defraud” petitioners out of the benefit of the cumulative compensation provided by the two contracts, was “planning to use” the railroad of the Rock Island, Arkansas & Louisiana Railroad Company, the entire capital stock of which was owned by the Chicago, Rock Island & Pacific Railway Company, instead *81 of the railroads of the St. Louis, Iron Mountain & Southern Railway, and the Texas & Pacific Railway Company, instead of moving down the west bank of the Mississippi River to Baton Rouge, will be diverted by way of Little Rock and Eunice, La., and turned in upon the line of the Gulf Company, thereby intending to obtain substantially the same advantages as are given under both contracts by paying the compensation provided under the Gulf contract only, and thereby wholly defrauding the Central and Valley Roads out of the rights contracted for under the Frisco contract.
That the Frisco Company had the power, and it was its duty, to perform the Frisco contract, and that the Frisco Company was in default thereunder by reason of its failure to use the privileges granted and to pay the rents and the proportion of petitioners’ expenses for maintenance, repairs, operation, and other charges as provided in articles 4 and 6 of the Frisco contract from and ¡jfter the 19th day of April, 1908, when the tracks of the Central Company were connected with the tracks of the Kansas City Company.
There is no allegation in the petition that the Frisco Company had in fact used the Gulf Company’s road for the purpose of its north and south business, or that it had used those tracks at all.
The alternative decrees asked for by the plaintiffs are not before the court in the present condition of the case. We find no reason for reversing the judgment appealed from, except in so far as to make it conform to the prayers of the defendant companies contained in their answer to the present appeal. Those prayers are hereby granted.
For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from is annulled, avoided, and reversed in so far as it sustains the exception of no cause of action filed on behalf of the Colorado Southern, New Orleans & Pacific Railroad Company, and the cause-as to that company is remanded to the district court, to be there further proceeded with according to law. Except as so altered and reversed, the judgment appealed from, is hereby affirmed.